## NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82911-4-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | PUBLISHED OPINION |
| ROBERT M. FLEEKS, JR., | |
| Appellant. | |

MANN, J. — Robert Fleeks Jr. was convicted of one count of second degree murder and one count of unlawful possession of a firearm in the second degree. Fleeks raises several arguments on appeal, including that his defense counsel was ineffective in failing to request a jury instruction on revived self-defense after the trial court granted the State's request for a first aggressor jury instruction. We agree with Fleeks that his trial counsel was ineffective and reverse his conviction for second degree murder and remand for a retrial.

Fleeks also argues that he was denied the right to a jury drawn from a fair cross-section of the community, denied the right to a fair trial because a security guard was

No. 82911-4-I/2

stationed behind him while he testified, denied the right to a fair trial because the trial court allowed improper opinion testimony on guilt, denied the right to confront witnesses when the trial court excluded evidence that a key witness was on probation, and that the prosecutor committed misconduct. We disagree.[1]

We reverse[2] the second degree murder conviction and remand for trial. We affirm the conviction for second degree unlawful possession of a firearm.

I.

Nineteen-year-old Fleeks often sold drugs on the streets of Seattle to make money.[3] On December 3, 2018, Fleeks was in the Pioneer Square neighborhood of Seattle selling drugs. After Fleeks received a text message from an unknown number, one of Fleeks's regular customers approached him and told him the text message was from Marlin George who wanted to buy some crack cocaine. Fleeks met George and sold him a small amount of crack cocaine. George smoked the crack cocaine immediately and asked for more. After Fleeks gave George some more crack cocaine,

---

[1] Fleeks also argues that the trial court erred in denying his motion for a mistrial after a witness repeatedly described George as being in a defense stance during testimony in violation of a pretrial ruling. Each time the trial court sustained George's objection to the testimony. Fleeks moved for a mistrial at the next recess, arguing the witness's testimony violated the court's pretrial ruling. The prosecutor explained, "I informed her not to use victim, not to use suspect, not to use aggressor, not talk about her speculation about how people were feeling or who was the aggressor or defending themselves." The court found that the violation was unintentional, had been stricken, and the jury would see on the video what occurred. Thus, the court denied Fleeks's motion for a mistrial. Because we are remanding for a new trial, Fleeks's challenge to the failure to grant a mistrial is moot.

[2] In a separate appeal, Fleeks challenges the trial court's restitution order. Because we reverse Fleeks's murder conviction and the restitution related to that charged crime and not the unlawful possession of a firearm, we vacate the restitution order. See State v. Fleeks, No. 83354-5-I (Wash. Ct. App. Jan. 23, 2023).

[3] Because our opinion turns on whether there was sufficient evidence to support the giving of an instruction on revived self-defense, our discussion of the facts reviews the evidence in the light most favorable to the party requesting the instruction—Fleeks. State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82911-4-I/3

George reached into his pocket as if to get his money, but then ran away with the drugs before paying Fleeks. Fleeks followed after George.

According to Fleeks's testimony at trial, Fleeks caught up with George in front of the Best Western Hotel in Pioneer Square and asked for his drugs back. George responded with strange hand gestures, incomprehensible mumbling, and pointing for Fleeks to go away. Then Fleeks saw George reach into his sock. Fleeks testified that he knew George could not have put the drugs into his sock because Fleeks would have seen him do so. Fleeks testified that he also saw a "glint of something" and concluded that George was reaching for a knife. As George moved closer, Fleeks kicked and brushed the side of George's head.

George then began to empty his pockets onto the sidewalk, as if to show that he did not have the drugs. As Fleeks was bent over looking down at the items on the ground, he testified he thought George was "lining up" as if preparing to throw a punch. George also continued to make strange hand gestures and mumble.

Fleeks testified that at this point he told George he was leaving and turned to walk away. As he walked, he looked behind and saw that George was following him. He saw George make a throat cutting gesture that Fleeks interpreted as a death threat. Fleeks stopped walking and put his back against the building wall because he did not want George behind him. As the two faced off, Fleeks testified that he saw George reach into his pocket, at which point Fleeks took out his gun and hit George with it. As he hit him, the base part of the gun fell apart and the bullets fell on the ground.

Fleeks testified that as he was looking at the bullets on the ground, George swung at him. As he did so, Fleeks testified that he saw a glint in George's hand again

-3-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and thought it was a blade. Fleeks backed down the sidewalk as George was swinging at him, eventually stepping backwards of the sidewalk. At that point Fleeks testified that he lost his balance, pulled his gun out of his back pocket, and fired one time from his hip.

After Fleeks checked himself to see if he had been shot, he walked back to where the bullets fell to the sidewalk. George was still standing up, stumbling and then fell to the ground. Fleeks testified that he did not know at that point if George had been shot; he did not see any blood. Fleeks checked the items George had dropped on the ground for the crack cocaine, and then tried to engage George but he wasn't responding. Fleeks then took off running.

Responding officers found George "pretty much lifeless." He had a crack cocaine pipe clutched in his left hand and a gunshot wound to his chest. George died later in the hospital. George had crack cocaine concealed behind his upper lip.

Police officers found Fleeks running through Pioneer Park. Ignoring commands to stop, Fleeks ran into an alleyway, abandoned his jacket in a stairwell, and discarded his pistol in the back of a garbage truck. Officers detained Fleeks and Anthony Leui identified him as George's assailant. Officers recovered nine unfired rounds of ammunition, baggies of crack cocaine, and a $100 bill in a trash pile near the alley. Fleeks's jacket contained an electronic scale, another baggie of crack cocaine, the baseplate for a pistol magazine, and ammunition. Officers also found a red beanie containing loose cigarettes in the alley.

Various surveillance cameras and Joshua Villalta's cell phone recorded a majority of the events. In the recordings, George appears intoxicated and is stumbling

and swaying. Various cameras show George running for several city blocks, with Fleeks in pursuit, until they stop in front of the Best Western. George and Fleeks appear to have an animated discussion. When George bends over, Fleeks kicks him in the head. George then empties his pockets onto the ground and Fleeks looks through the items. George periodically lifts his shirt, presumably to show Fleeks that nothing is concealed.

Fleeks appears to walk away with George following close behind and to his side. Fleeks then strikes George with a pistol. George throws a hard punch at Fleeks. After walking away, Fleeks returns and begins picking small objects from off the ground and rifling through George's pockets. Fleeks finally picks up the loose cigarettes and runs from the scene.

The State charged Fleeks with one count of murder in the second degree, and one count of unlawful possession of a firearm in the second degree. The jury convicted Fleeks as charged. The court imposed an exceptional sentence below the standard range based on Fleeks's youth and "functional maturity."

Fleeks appeals.

II.

Fleeks argues that his trial counsel was ineffective in failing to request a jury instruction on revived self-defense. Because we agree, and conclude that his counsel's conduct requires reversal of his conviction, our analysis begins here.

A.

To establish ineffective assistance of counsel, a defendant must show that counsel performed deficiently and that the deficient performance resulted in prejudice.

-5-

No. 82911-4-I/6

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This court reviews allegations of ineffective assistance of counsel de novo. State v. Wafford, 199 Wn. App. 32, 41, 397 P.3d 926 (2017).

An attorney acts deficiently if their conduct falls "below an objective standard of reasonableness." State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). The defendant must show that any errors made were "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." State v. Fortun-Cebada, 158 Wn. App. 158, 167, 241 P.3d 800 (2010). The reasonableness inquiry presumes effective representation and requires the defendant to show the absence of legitimate strategic or tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995). Competency of defense counsel is determined based on the entire record below. McFarland, 127 Wn.2d at 335.

Fleeks argues that his trial counsel was ineffective by failing to request a jury instruction on revived self-defense. To show deficient conduct based on failure to request a jury instruction, the defendant must first establish that he would have been entitled to the instruction. State v. Cienfuegos, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001).

A defendant is entitled to an instruction if it is "supported by substantial evidence in the record." State v. Griffith, 91 Wn.2d 572, 574, 589 P.2d 799 (1979). To determine whether there is sufficient evidence to support giving an instruction, a court views the evidence in the light most favorable to the party requesting the instruction, in this case, Fleeks. State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). To show prejudice, the defendant must prove that, but for the deficient performance, there

-6-

No. 82911-4-I/7

is a reasonable probability that the outcome would have been different. In re Pers.

Restraint of Pirtle, 136 Wn.2d 467, 487, 965 P.2d 593 (1998).

"Generally, a slayer may not claim self-defense to justify a killing when they were

the aggressor or provoked the confrontation." State v. Hatt, 11 Wn. App. 2d 113, 135,

452 P.3d 577 (2019) (citing State v. Craig, 82 Wn.2d 777, 783, 514 P.2d 151 (1973)). A

court may give a "first aggressor" jury instruction where "there is credible evidence from

which a jury can reasonably determine that the defendant provoked the need to act in

self-defense." State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999).[4] Washington

recognizes, however, that the right of self-defense is revived as to the aggressor if that

person in good faith withdraws from the aggression in such time and manner as to

clearly apprise the other person that they intend to disengage in further aggression:

> It is the rule one who was the aggressor or who provoked the altercation in
> which he killed the other person engaged in the conflict, cannot
> successfully invoke the right of self-defense to justify or excuse the
> homicide, unless he in good faith had first withdrawn from the combat at
> such a time and in such a manner as to have clearly apprised his
> adversary that he in good faith was desisting, or intended to desist, from
> further aggressive action.

Craig, 82 Wn.2d at 783; State v. Dennison, 115 Wn.2d 609, 617, 801 P.2d 193 (1990).

See also 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL

16.04 cmt. (5th ed. 2021) (WPIC).

---

[4] "'An aggressor instruction impacts a defendant's claim of self-defense,' so 'courts should use care in giving an aggressor instruction.'" State v. Gott, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting Riley, 137 Wn.2d at 910, n. 2).

No. 82911-4-I/8

B.

Over Fleeks's objection, the trial court agreed with the State that there was sufficient evidence to give a first aggressor jury instruction. The jury was instructed accordingly:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense. However, words that do not constitute a threat to a person are not adequate provocation to negate self-defense.

Defense counsel did not, however, request an instruction on revived self-defense.

During closing arguments, defense counsel explained that "[h]e doesn't lose the right to self-defense because when he peacefully confronted the person who just stole from him, the person comes at him aggressive. This didn't happen because of [Fleeks's] provocation. It happened because Marlin George stole from [Fleeks] and then reacted aggressively when confronted. And remember, a few moments later, [Fleeks] actually started walking away. It was Marlin George again who continued to escalate." Defense counsel could not, however, reference a jury instruction addressing revived self-defense.

After the verdict, Fleeks moved for a new trial based on ineffective assistance of counsel. Fleeks argued that his trial attorneys were deficient for failing to offer an instruction on revived self-defense. Trial counsel filed a declaration admitting he had "simply neglected" to request the instruction and had "no strategic or tactical reason" for failing to do so.

-8-

No. 82911-4-I/9

The court denied the request, finding the evidence did not support an instruction on revived self-defense. It explained that the video showed Fleeks was the aggressor "for the majority of a very long period of time." And even if Fleeks did start to leave, the court explained that Fleeks's decision to hit George with the end of the pistol "negate[d] any entitlement to a revival instruction."

The court then considered defense counsel's performance within the context of the entire trial record:

> Defense counsel . . . did a really stellar job of litigating this case, and the Defense was particularly zealous presented a lot of evidence to support their theory of the case including the expert testimony. And the failure to request this particular instruction given the . . . entirety of the performance of counsel and the theory and the manner in which their theories were argued . . . does not lead the Court to conclude that there was ineffective assistance of counsel.

The trial court also found that even if defense counsel were deficient in failing to request the instruction, Fleeks failed to show prejudice:

> [T]here's not a reasonable probability that the verdicts would've been different. Highly unlikely given the manner in which the video contradicts the testimony and theory of the Defense given that there was the reengagement that was clearly demonstrated.

C.

The trial court erred in concluding that defense counsel was not deficient in failing to request a revived self-defense instruction because, in its view, Fleeks was not entitled to the instruction in the first place. We review a trial court's factual basis for not giving a requested jury instruction for abuse of discretion. State v. Ponce, 166 Wn. App. 409, 416, 269 P.3d 408 (2012). But we review de novo a trial court's refusal to give a

-9-

No. 82911-4-I/10

requested instruction if the refusal is based on a ruling of law. Ponce, 166 Wn. App. at 416.

Here, it appears the trial court erred as a matter of law by weighing the evidence and determining that the video contradicted Fleeks's testimony. The correct standard was whether there was substantial evidence in the record to support a revived self-defense instruction. And, more importantly, the evidence must be viewed in the light most favorable to the requesting party—Fleeks. Fernandez-Medina, 141 Wn.2d at 455-56; Ponce, 166 Wn. App. at 416.

Consistent with Fleeks's testimony, the Best Western surveillance video shows that Fleeks does appear to break the aggression and walk away from George. George follows and makes a throat-slashing gesture. At that point, consistent with his testimony, Fleeks turns and puts his back up against the wall while George continues to gesture at him. While Fleeks does appear to strike at George with his pistol, George then unequivocally throws a hard punch at Fleeks. The video does not clearly capture the ensuing encounter, including the actual shooting. Consistent with Fleeks's testimony, George can be seen stumbling while Fleeks goes back to examine the items dropped on the sidewalk.

Viewed in a light most favorable to Fleeks, substantial evidence is not inconsistent with Fleeks's testimony of the events. The video and Fleeks's testimony present an issue of fact whether Fleeks withdrew from the conflict, that the jury should determine. Considering that the jury was instructed on first aggressor, but was not instructed on revived self-defense, Fleeks could not argue his defense based on either

-10-

No. 82911-4-I/11

self-defense or revived self-defense theories. Thus, counsel was deficient in not putting forth a revived self-defense instruction with no tactical reason for doing so.

Fleeks also demonstrates prejudice. Considering the combination of the surveillance video and Fleeks's consistent testimony that he was trying to disengage and walk away, if the defense counsel had requested a self-defense instruction, the trial court's failure to offer the instruction would likely have been an error of law and abuse of discretion. Fernandez-Medina, 141 Wn.2d at 455-56; Ponce, 166 Wn. App. at 416. Had the jury been properly instructed, it may have concluded that Fleeks had withdrawn and that his right to self-defense had been revived. Trial counsel's deficient performance prejudiced Fleeks. Defense counsel's failure to request a revived self-defense instruction denied Fleeks effective assistance of counsel. We reverse the second degree murder conviction.

III.

While we reverse and remand for a new trial on Fleeks's conviction of second degree murder, we must still address his other arguments as they pertain to his conviction of unlawful possession of a firearm in the second degree. Fleeks first argues that Black jurors are underrepresented on King County venires in violation of the Sixth Amendment's guarantee to a jury drawn from a fair cross-section of the community. We disagree.

A.

Before trial, Fleeks moved for a jury drawn from a fair cross-section of the community, or alternatively from a county-wide pool. The motion relied largely on a report by Professor Katherine Beckett using survey data gathered over a period of 20

-11-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

court days in 2015 (Beckett Report).  Based on the 2015 survey data, the Beckett

Report showed that in King County as a whole, Blacks represented 5.6 percent of the

population, but only 3.61 percent of the jury pool over the days surveyed leading to an

absolute disparity of 1.98 percent (5.6% - 1.98%).  This equals a comparative disparity

of 35.5 percent (1.98% / 5.6%).  King County is divided into two assignment areas:

Seattle and Kent.  Based on the same 2015 survey data, the Beckett Report found that

for King County's Seattle jury assignment area, Blacks represented 4.14 percent of the

population but 2.29 percent of the jury pool for a 1.8 percent absolute and 44.7 percent

comparative disparity.  For the Kent jury assignment area, Blacks represented 8.11

percent of the population and 5.33 percent of the jury pool for an absolute disparity of

2.79 percent and comparative disparity of 34.4 percent.

The trial court found that Fleeks failed to show "that any underrepresentation . . .

is due to. . . systematic exclusion in the jury selection process."  The court also found no

evidence "to support the Defense claim that the . . . division [into multiple jury

assignment areas] is responsible for . . . any underrepresentation."

Fleeks renewed his argument after voir dire based on his counsel's observation

that there were only two Black people in the venire.  The trial court again denied

Fleeks's motion:

> [w]e have seen one venire panel that was clearly not proportionate with
> regard to representation of African Americans . . . the representation of
> this particular panel was low, which could happen even if the system was
> perfect, so it's not enough information for me to change the decision that I
> made pretrial.

No. 82911-4-I/13

B.

A defendant has a right under the Sixth Amendment and Fourteenth Amendments to the U.S. Constitution, and article I, § 22 of the Washington Constitution, to be tried by a jury that is representative of the community. Taylor v. Louisiana, 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); State v. Hillard, 89 Wn.2d 430, 440-42, 573 P.2d 22 (1977). Representation, however, need not be perfectly proportional to the population, and the composition of the jury need not be of any particular composition. Hillard, 89 Wn.2d at 440-42. A jury selection process is adequate so long as it "may be fairly said that the jury lists or panels are representative of the community." Taylor, 419 U.S. at 538.

To establish a prima facie case of a violation of the right to a fair cross-section, a defendant must establish "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to system exclusion of the group in the jury-selection process." Cienfuegos, 144 Wn.2d at 231-32 (quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 668, 58 L. Ed. 2d 579 (1979)). All three Duren factors must be met to establish a constitutional violation. Duren, 439 U.S. at 364. If all three factors are met, the State bears the burden of justifying the infringement by showing that the process nonetheless serves to "manifestly and primarily advance[]" a "significant state interest." Duren, 439 U.S. at 367-68. We review a trial court's rulings on challenges to the venire process for abuse of discretion. State v. Clark, 167 Wn. App. 667, 674, 274 P.3d 1058 (2012).

-13-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82911-4-I/14

C.

The parties do not dispute that Blacks are a distinctive group in the community and thus the first Duren element is met. In re Pers. Restraint of Yates, 177 Wn.2d 1, 20, 296 P.3d 872 (2013). As a result, we next address whether Fleeks has shown that King County's jury summons system results in an underrepresentation of Blacks in the venire pool from which jurors are drawn.

1.

Again, a defendant "is not entitled to exact cross-representation in the jury pool, nor need the jury selected for his trial be of any particular composition." Hilliard, 89 Wn.2d at 442. "The point at which to consider the constitutionality of the selection process has usually been at the selection of a master list from which the panel for each jury term is selected." State v. Salinas, 87 Wn.2d 112, 115, 549 P.2d 712 (1976). Fleeks does not challenge the way King County Superior Court generates its master list of perspective jurors. Nor does he argue that the court departed from the statutory procedures for creating the master list and there is no evidence that it did.

Chapter 2.36 RCW guides the assembly of Washington jury panels. Each county in Washington identifies potential jurors by creating a "jury source list." RCW 2.36.054. A "jury source list" consists of "all registered voters," "licensed drivers," and "identicard holders" residing in the county. RCW 2.36.010(10).[5] Potential jurors are then selected from the jury source list at random for each jury term. RCW 2.36.010(9), 065. The court then sends those potential jurors summonses through mail. RCW 2.36.095.

---

[5] RCW 2.36.054 sets out the method for creating the jury source list, "unless otherwise specified by rule of the supreme court." General Court Rule (GR) 18 also defines the jury source list as the list of "all registered voters of a county, merged with a list of licensed drivers and identicard holders who reside in that county."

-14-

No. 82911-4-I/15

In Hilliard, our Supreme Court held that the statutory method of selecting jurors at random from voter registration lists is the best source of compiling a fair cross-section of the community. 89 Wn.2d at 440. The legislature later expanded the jury source list to include driver's license and identicard holders to make the pool of eligible jurors more inclusive and representative. State v. Lanciloti, 165 Wn.2d 661, 668-69, 201 P.3d 323 (2009). In 2005, the legislature began allowing counties with multiple superior court facilities to create separate "jury assignment areas." RCW 2.36.055. This legislation was enacted based on data compiled by King County Superior Court judges working with the Seattle-King County Department of Public Health, which showed that "lower income and racial minority citizens were less likely . . . to report to a courthouse more distant from their home." Lanciloti, 165 Wn.2d at 664. King County created the Kent and Seattle jury assignment areas with the express intent of increasing minority participation. Lanciloti, 165 Wn.2d at 664-65. We have no basis to conclude from this record that the way King County Superior Court generates its master list of prospective jurors violates the statutory directives for generation of the list, GR 18, or the state or federal constitutions.

2.

Courts look to statistics to assess the degree to which the jury pool underrepresents a distinctive group within a community. United States v. Savage, 970 F.3d 217, 255 (3d Cir. 2020). Fleeks argues that we should adopt comparative disparity as the appropriate test for determining whether Blacks are underrepresented on King County Superior Court jury pools.

No. 82911-4-I/16

Absolute disparity "is determined by subtracting the percentage of a [distinct group] in the jury pool . . . from the percentage of [that group] in the local, jury-eligible population." Berghuis v. Smith, 559 U.S. 314, 323, 130 S. Ct. 1382, 176 L. Ed. 2d 249 (2010). For example, if Group X makes up 5 percent of the population, but is only 3 percent of the jury pool, there is an absolute disparity of 2 percent. Comparative disparity "expresses the absolute disparity as a percentage of the . . . group's overall representation in the community." Colleen P. Fitzharris, Note, Can We Calculate Fairness and Reasonableness? Determining What Satisfies the Fair Cross-Section Requirement of the Sixth Amendment, 112 MICH. L. REV. 489, 501 (2013). "Courts calculate the comparative disparity by dividing the absolute disparity by the percentage of the distinctive group in the community." Fitzharris, at 501. Continuing the above example, while Group X would have an absolute disparity of 2 percent, it would have a comparative disparity of 40 percent—meaning 60 percent of jurors from Group X are missing from the annual venire.

"Each test is imperfect. Absolute disparity and comparative disparity measurements can be misleading when, as here, 'members of the distinctive group comp[ose] [only] a small percentage of those eligible for jury service.'" Berghuis, 559 U.S. at 329 (quoting People v. Smith, 615 N.W.2d 1 (2000)). But comparative disparity has been especially criticized because it "exaggerates the effect of any deviation." Thomas v. Borg, 159 F.3d 1147, 1150 (9th Cir. 1998); United States v. Hernandez-Estrada, 749 F.3d 1154, 1164-65 (9th Cir. 2014).

Hilliard, the last Washington Supreme Court case to address jury diversity in detail, relied solely on an absolute disparity. 98 Wn.2d at 442-43. But neither Hilliard,

-16-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82911-4-I/17

nor any other Washington case, has expressly precluded considering other methodologies. The U.S. Supreme Court found "no cause to take sides . . . on the method or methods by which underrepresentation is appropriately measured." Berghuis, 559 U.S. at 329. The Ninth Circuit has likewise "decline[d] to confine district courts to a particular analytical method." Hernandez-Estrada, 749 F.3d at 1164-65. We decline to do so here.

3.

Fleeks relies on the Beckett Report to show that Blacks are underrepresented on King County Superior Court juries. The Beckett Report shows, and King County concedes, that at the time of the 2015 survey, Blacks "are likely underrepresented to some degree in King County." But the Beckett Report alone fails to establish a constitutional defect.

First, the Beckett Report's conclusion relied on survey data gathered from summonsed jurors on 20 court days from January 12 to April 1, 2015. The data has never been updated, and the record is silent on whether Black participation on King County Superior Court juries has changed since 2015. Moreover, while Professor Beckett found the response rate reasonably reliable, she noted that "the race of those who declined to take a survey was not recorded, so comparison of the racial composition of those who did not take a survey [over 30 percent in Seattle] is not possible."

Second, while the Beckett Report shows that Blacks are underrepresented in King County jury service, underrepresentation does not automatically create a constitutional defect. As the court in Yates explained:

-17-

No. 82911-4-I/18

> mere "underrepresentation," in the sense that a group's representation is not at least equal to its proportion of the community, is not sufficient to show that the representation is not "fair and reasonable," Duren, 439 U.S. at 364, 99 S. Ct. 664. For example, in United States v. Orange, 447 F.3d 792, 796 (10th Cir. 2006), a defendant presented evidence that in a given year, four groups were underrepresented in jury venires: African-Americans comprised 8.63 percent of the eligible population but only 5.06 percent of the venires, Native Americans comprised 4.27 percent of the eligible population but only 2.64 percent of venires, Asians comprised 1.64 percent of the eligible population but only 0.80 percent of venires, and Latinos comprised 2.74 percent of the eligible population but only 1.49 percent of the venires. The court held that this failed to establish the second Duren factor (i.e., that the representation of the groups was not fair and reasonable in relation to the population). *Id.* at 798-99. . . . Orange illustrates that a mere allegation of "underrepresentation" is insufficient to establish the second Duren factor.

177 Wn.2d at 20-21.

The defendant in Hilliard, for example, demonstrated that Black citizens were 4 percent of the county's population, but only 1.3 percent of the jury pool. 89 Wn.2d at 442-43. Despite leading to an absolute disparity of 2.7 percent—larger than the disparity in the Beckett Report findings—the Hilliard court concluded that this was "not a constitutionally significant disparity." 89 Wn.2d at 442.

Fleeks cites Garcia-Dorantes v. Warren, 801 F.3d 584, 587 (6th Cir. 2015), to support that the second Duren factor is met here. Garcia-Dorantes found the second Duren factor satisfied because the comparative disparity was 42 percent with an absolute disparity of 3.45 percent calculated from a population percentage of 8.24 percent. 801 F.3d at 590-93. Fleeks argues that because the comparative disparity of the Seattle assignment area is greater than that in Garcia-Dorantes, the second Duren factor is satisfied.

-18-

No. 82911-4-I/19

Garcia-Dorantes is distinguishable.  First, the Black population in Garcia-Dorantes was 8.24 percent, while the Black population in the Seattle assignment area is 4.1 percent.  Again, comparative disparity may exaggerate the disparity in a small population size.  Hernandez-Estrada, 749 F.3d at 1163; Orange, 447 F.3d at 798 ("the smaller the group is, the more the comparative disparity figures distorts the proportional representation.").  Second, the majority of other courts have declined to find a Duren violation based on similar degrees of comparative disparity, particularly when considering a small subset of the population.  See Howell v. Superintendent Rockview SCI, 939 F.3d 260, 268 (3d Cir. 2019) (comparative disparity of 54.49 percent was not unreasonable); United States v. Chanthadara, 230 F.3d 1237, 1257 (10th Cir. 2000) (no error from comparative disparity of 58.39 percent); United States v. Shinault, 147 F.3d 1266, 1273 (10th Cir. 1998) (comparative disparity of almost 60 percent acceptable where the numbers "are distorted by the small population of the . . . groups"); Smith v. Yeager, 465 F.2d 272, 278-79 n.18 (3d Cir. 1972) (noting it would be "absurd" to employ comparative analysis where the Black population is only 4.4 percent).

We conclude that Fleeks has not shown that representation of Black persons in King County is "not fair and reasonable in relation to the number of such persons in the community."  Duren, 439 U.S. at 357

D.

Even if, however, Fleeks can show underrepresentation, the third Duren factor requires Fleeks to show that the underrepresentation is systemic.  Cienfuegos, 144 Wn.2d at 231-32; Duren, 439 U.S. at 364.

-19-

No. 82911-4-I/20

Underrepresentation of a distinct group is systemic when it is "inherent in the particular jury-selection process utilized." Duren, 439 U.S. at 366. Systemic exclusion need not be deliberate. Hilliard, 89 Wn.2d at 441. But underrepresentation alone is insufficient; the defendant must show that the implicated group receives different treatment than other citizens. Randolph v. California, 380 F.3d 1133, 1141 (9th Cir. 2004).

In Duren, for example, Duren first demonstrated that the distinct group, women, were statistically underrepresented; women were over half the jury-eligible population yet, in stark contrast, accounted for less than 15 percent of jury venires. Duren, 439 U.S. at 364-66. Duren was also able to show that women were systematically excluded. As the Supreme Court summarized in Berghuis:

> [Duren] proved that women's underrepresentation was persistent—occurring in every weekly venire for almost a year—and he identified the two stages of the jury-selection process "when . . . the systematic exclusion took place." First, questionnaires for prospective jurors stated conspicuously that women could opt out of jury service. Less than 30% of those summoned were female, suggesting that women in large numbers claimed the exemption at the questionnaire stage. "Moreover, at the summons stage women were . . . given another opportunity to [opt out]." And if a woman ignored the summons, she was deemed to have opted out; no further inquiry was made. At this "final, venire, stage," women's representation plummeted to 14.5%. In the Federal District Court serving the same territory, the Court noted, despite a women-only childcare exemption, women accounted for nearly 40% of those actually serving on juries.
>
> The "disproportionate and consistent exclusion of women from the [Jackson County] jury wheel and at the venire stage," the Court concluded, "was quite obviously due to the *system* by which juries were selected." "[A]ppropriately tailored" hardship exemptions, the Court added, would likely survive a fair-cross-section challenge if justified by an important state interest. But no such interest, the Court held, could justify Missouri's exemption for each and every woman—the altogether evident explanation for the underrepresentation.

-20-

No. 82911-4-I/21

Berghuis, 559 U.S. at 328 (quoting Duren, 439 U.S. at 366-370) (internal citations omitted).

In Garcia-Dorantes, another case relied on by Fleeks, Garcia-Dorantes was also able to show a systemic exclusion of Black jurors after a county conducted internal study revealed that "nearly 75 percent of the county's 454,000 eligible residents were excluded from potential jury police since spring 2001" and that "[m]any Blacks were excluded from . . . jury pools due to a computer glitch that selected a majority of potential candidates from the suburbs." Garcia-Dorantes, 801 F.3d at 590. Indeed, the chief judge of the county circuit court recognized, "[t]here has been a mistake—a big mistake." Garcia-Dorantes, 801 F.3d at 591.

Fleeks fails to demonstrate similar systemic exclusion. Unlike Duren, Washington makes jury eligible any "person" unless disqualified for being (1) not yet 18; (2) not a U.S. citizen; (3) not a county resident; (4) not able to communicate in English; or (5) a felon that has not had their voting rights restored. RCW 2.36.070. There are no exclusions based on an individual's race or sex.

And, as discussed above, the legislature has repeatedly addressed the methods for compiling the jury lists "in an effort to make the pool of eligible jurors more inclusive and representative." Lanciloti, 165 Wn.2d at 668. When Washington relied only on voter registration, our Supreme Court described it as "the best source [for] compiling a fair cross-section." Hilliard, 89 Wn.2d at 440-41. Now the process is even more inclusive. The dispositive question is whether King County systematically under summons Black citizens. Washington has an inclusive and robust system for

No. 82911-4-I/22

summoning jurors. It is not systematic exclusion on the part of King County if properly summonsed jurors fail to respond. Rocha v. King County, 7 Wn. App. 2d 647, 656, 435 P.3d 325 (2019).

Additionally, the creation of two assignment areas by King County: Seattle and Kent, does not constitute systematic exclusion. Fleeks argues that because the Kent assignment area has a larger population of Black citizens, the separation creates systematic exclusion. This argument is unpersuasive.

The Washington legislature created two assignment areas as a solution to the racial disparities caused by a unitary jury pool. Lanciloti, 165 Wn.2d at 664 n.1. The Ninth Circuit rejected a similar argument in United States v. Cannady, 54 F.3d 544 (9th Cir. 1995). Cannady was prosecuted in a district that spanned seven counties, and was therefore subdivided into three judicial divisions. Cannady, 54 F.3d at 545. The Central District had two courthouses in Los Angeles and Santa Ana. The district enacted a policy by which jurors for the Santa Ana courthouse were drawn only from the Southern and Eastern Divisions, while jurors from the Los Angeles courthouse were drawn solely from the Western Division. Cannady, 54 F.3d at 545-46. The Ninth Circuit disagreed that the system resulted in underrepresentation, finding "no constitutional right to a jury drawn from an entire judicial district, rather than from one division of the district." Cannady, 54 F.3d at 547. In the case of division, only gerrymandering will constitute a systematic exclusion. Cannady, 54 F.3d at 547.

-22-

No. 82911-4-I/23

It is unclear how requiring jurors to travel farther would serve the purpose of increasing minority turnout, especially considering the division was enacted to combat low minority turnout. [6]

Fleeks has not shown that King County Superior Court systemically excludes Black citizens from jury venires.

E.

Fleeks next asks that we abandon the systematic exclusion test in Duren and hold that article 1, sections 21 and 22 of our Washington State Constitution, in combination, "provides greater protection than the Sixth Amendment and requires reasonable steps to address systematic underrepresentation of distinctive groups." But we decline to reach this issue because, even if correct, Fleeks did not demonstrate any "reasonable step" that would align with chapter 2.36 RCW and GR 19, and also would likely, and on a non-speculative basis, improve participation of Black jurors.[7]

IV.

Fleeks next argues that the trial court erred in allowing improper opinion testimony on his guilt by allowing the jury to review the transcript from a portion of a police interview with Fleeks, where the interviewing detective referred to Fleeks as

---

[6] We also note that Fleeks had the ability to ask the trial court to transfer venue to the Kent assignment area if he believed he would receive a more representative jury venire in that courthouse. King County Superior Court Local Rule (KCLCrR) 5.1(d)(3)(E) states that "The Court on its own motion or on the motion of a party may assign or transfer cases to another case assignment area in the county whenever required for the just and efficient administration of justice in King County." Fleeks did not move to change venue.

[7] Our Supreme Court recently accepted review of whether article 1, sections 21 and 22 provide greater protection of a defendant's fair cross-section right than the United States Constitution. See Ruling Accepting Certification, State v. Rivers, No. 100922-4 (Wash. May 12, 2022). Fleeks has not requested that we stay this decision pending the outcome of Rivers.

No. 82911-4-I/24

"cold-hearted." We agree with Fleeks that the testimony was improper. On retrial, the reference should be redacted.

A.

"Opinion testimony" is testimony that is "based on one's belief or idea rather than on direct knowledge of the facts at issue." BLACK'S LAW DICTIONARY 1779 (11th ed. 2019). Witnesses may not testify in the form of opinions about the defendant's guilt or innocence. State v. Montgomery, 163 Wn.2d 577, 594, 183 P.3d 267 (2008). Opinions on guilt are improper because they impede the jury's ability to make an independent determination of the facts. State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). Testimony given by police officers possess an aura of reliability that make them particularly problematic. Montgomery, 163 Wn.2d at 595.

"Testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence, is not improper opinion testimony." State v. Smiley, 195 Wn. App. 185, 190, 379 P.3d 149 (2016). Opinion testimony is improper when it comments on the veracity or intent of a witness, tells the jury what decision to reach, or "leaves no other conclusion but that a defendant is guilty." State v. Cruz, 77 Wn. App. 811, 815, 894 P.2d 573 (1995); State v. Quaale, 182 Wn.2d 191, 200, 340 P.3d 213 (2014). We review the decision to admit evidence for abuse of discretion. State v. Quaale, 177 Wn. App. 603, 610, 312 P.3d 726 (2013).

B.

After arrest, the police interviewed Fleeks and he denied any connection with George's death. When the police showed Fleeks surveillance footage, he continued to

-24-

No. 82911-4-I/25

deny being the person in the footage. Detective James Cooper continued to ask Fleeks to explain the encounter and shooting. Detective Cooper asked whether George was "fucking with you or . . . something like that[?]" Fleeks continued to deny any involvement. Detective Cooper made the following comment:

Do you wanna explain anything to me? This, this is probably your last chance to try to make yourself not look so cold-hearted and stuff like that. We have witnesses that put you there, that identified you there. We have those pictures, that's off a video, dude . . . I, I mean you're 19 . . . was there an argument was there a disturbance, a fight, anything . . . so do you wanna explain what happened?

Defense counsel objected to the jury hearing the interview recording. Fleeks argued that the comment was an improper opinion of guilt, specifically, referring to Fleeks as "cold-hearted." Conversely, the State argued that Detective Cooper was referring to his casual demeanor and unwillingness to cooperate, in conflict with Fleeks's claim of self-defense. The trial court found the interview admissible:

It is relevant to demonstrate the demeanor of Mr. Fleeks, which is relevant especially in light of the fact that [the] defense expert is retained to explain the behavior.

Beginning on Page 33 at the top, that portion is also relevant. And given that Mr. Fleeks is specifically asked really to indicate whether there was any kind of a disturbance or a fight, kind of inviting an offer of a self-defense explanation, it's highly relevant. And that relevance outweighs the prejudice. I'll allow it.

C.

We disagree with the trial court. While Detective Cooper's statement is an observation that Fleeks did not appear remorseful, it improperly commented on Fleeks's intent and effectually directed the jury to not believe Fleeks's self-defense theory. Detective Cooper's opinion that Fleeks should make himself "look not so cold-hearted"

No. 82911-4-I/26

could easily appear to the jury as a belief that Fleeks was guilty of murder, not acting in self-defense. This testimony could interfere with the jury's ability to determine every fact beyond a reasonable doubt.

But because we reverse Fleeks's conviction on other grounds and remand for a new trial, on retrial Detective Cooper's testimony should be redacted to exclude the "cold-hearted" statement.

V.

Fleeks argues that the stationing of a courtroom officer at an exit door near the witness stand while he testified violated his right to a fair trial. We disagree.

A.

All criminal defendants are entitled to a fair trial, which includes the presumption of innocence. State v. Jaime, 168 Wn.2d 857, 861-62, 233 P.3d 554 (2010). This principle also requires that courts preserve "the physical indicia of innocence." Jaime, 168 Wn.2d at 861-62. The court must avoid intrusive security measures that "single out a defendant as a particularly dangerous . . . person." Jaime, 168 Wn.2d at 861-62. While some practices such as shackling or gagging a defendant are highly prejudicial, courts have taken a milder view towards uniformed security officers, noting "the wider range of inferences":

> Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public

No. 82911-4-I/27

places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

Holbrook v. Flynn, 475 U.S. 560, 567, 106 S. Ct. 1340 89 L. Ed. 2d 525 (1986).

Jail officers are not "inherently prejudicial," thus, it does not require any specific findings. State v. Gorman-Lykken, 9 Wn. App. 2d 687, 695-96, 446 P.3d 694 (2019). But placing a jail officer "next to a testifying defendant," has the "potential for prejudice." Gorman-Lykken, 9 Wn. App. 2d at 696. Courts should make case-specific findings and consider the possibility of unfair prejudice before authorizing arrangements that place jail officers near testifying defendants. Gorman-Lykken, 9 Wn. App. 2d at 697-98.

B.

A reviewing court considers whether the security procedures at trial created "an unacceptable risk of impermissible factors coming into play" and any mitigating efforts undertaken by the trial judge. State v. Bejar, 18 Wn. App. 2d 454, 461, 491 P.3d 229 (2021); see State v. Butler, 198 Wn. App. 484, 494, 392 P.3d 424 (2017). We review a trial judge's decisions on courtroom security for abuse of discretion. Bejar, 18 Wn. App. 2d at 460-61.

It is unlikely that the jail officer caused prejudice to Fleeks. The trial courtroom in Fleeks's case had an exit door in the area of the witness stand, thus, an officer needed to stand by the door while any inmate testified to ensure courtroom security. Even with the door being close to the witness stand, one officer posted by a door would be unlikely to have been taken as a sign of anything but a normal official concerned for the safety and order of the proceeding.

-27-

No. 82911-4-I/28

The trial court also required the jail officer be stationed at the door for the entire morning to reinforce the routine appearance of the officer. Fleeks was not escorted to the stand or otherwise treated differently and the number of jail officers remained the same. There was no suggestion to the jury that Fleeks's testimony required additional reinforcements. Thus, it was unlikely the jury inferred any more prejudice because of the stationing of the jail officer. The trial court did not abuse its discretion.

VI.

Fleeks argues that the trial court abused its discretion in excluding evidence that eye witness Anthony Leui was on probation for a DUI at the time of George's murder. We disagree.

A.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Evidence that is not relevant is generally inadmissible. ER 402. Minimally relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403.

Our state and federal constitutions guarantee accused persons the right to present a defense and to confront witnesses by cross-examination. State v. Orn, 197 Wn.2d 343, 347, 482 P.3d 913 (2021). Courts engage in a three-part analysis to determine whether a limitation on cross-examination violated a defendant's Sixth Amendment right to confrontation:

> First, the evidence must be of at least minimal relevance. Second, if
> relevant, the burden is on the State to show the evidence is so prejudicial
> as to disrupt the fairness of the fact-finding process at trial. Finally, the

No. 82911-4-I/29

> State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld.

State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002).

A trial court may decline cross-examination "where the circumstances only remotely tend to show bias or prejudice of the witness, where the evidence is vague, or where the evidence is merely argumentative and speculative." State v. Roberts, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980).

This court reviews an alleged violation of a defendant's right to confrontation de novo, however, the trial court's rulings limiting cross-examination are normally "afforded great deference." State v. Medina, 112 Wn. App. 40, 48, 48 P.3d 1005 (2002); State v. French, 157 Wn.2d 593, 605, 141 P.3d 54 (2006).

B.

Leui was convicted of a DUI in May 2017 and placed on probation for 5 years. Leui was required to abstain from drugs and alcohol during his probation. Leui tested positive for alcohol in August 2018 and THC in January 2020.

Defense counsel sought to depose Leui about his probation, arguing that he may be pressured to testify "in a way that would not offend the State for fear of retribution." Defense counsel also argued that lying about his alcohol and THC consumption while on probation was relevant to his credibility. Conversely, the State argued that Leui's probation status was irrelevant because Leui's observations were almost entirely cumulative to the surveillance footage and Leui's credibility was only important to prove identity, which Fleeks was conceding.

-29-

No. 82911-4-I/30

The court did not order a deposition and excluded evidence of Leui's probation status as irrelevant:

> Moving on to the DUI probation status, I haven't heard anything to lead to the conclusion that there is a connection between the probationary status and a motive to fabricate. This isn't a situation where . . . Mr. Leui was needing to address . . . whether he was under the influence of anything, which I guess conceivably could be attacked knowing that it would be a probationary violation. I don't have any evidence to support a connection, so I won't allow reference to the [fact] of DUI probation status.

C.

Here, there was no evidence that Leui was worried about his probation; that the officers knew of his probation status; or that he was intoxicated during his shift. The State has a compelling interest in excluding evidence that might prejudice the jury against a witness based on their history of drug use. State v. McDaniel, 83 Wn. App. 179, 187, 920 P.2d 1218 (1996). Whether Leui was on probation or not was minimally relevant evidence at best, and the potential prejudice to the State outweighs any benefit to Fleeks.

Fleeks relies on Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Davis was charged with stealing a safe found emptied near the home of Richard Green. Davis, 415 U.S. at 309. Green claimed to have seen Davis near the area where the safe was found holding a crowbar, and this testimony was the primary evidence connecting Davis to the crime. Green was on probation for burglary at the time, and Davis theorized he made "a hasty and faulty identification . . . to shift suspicion away from himself . . . [and] might have been subject to undue pressure from the police . . . under fear of possible probation revocation." Davis, 415 U.S. at 311. The

-30-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82911-4-I/31

trial court prohibited Davis from cross-examining Green about being on probation and the court reversed. Davis, 415 U.S. at 310-11.

The court prevented Davis from challenging Green's "protestations of unconcern over possible police suspicion that he might have had a part in the . . . burglary and his categorical [and untrue] denial of ever having been the subject of any similar law-enforcement interrogation." Davis, 415 U.S. at 313-14. Thus, not allowing cross-examination of Green let the jury hear a questionably truthful answer to a relevant line of inquiry. Davis, 415 U.S. at 314.

This case is distinguishable. In Davis, the court reasoned that Green was "a crucial identification witness," and the jury would likely have acquitted Davis if it did not believe him. Davis, 415 U.S. at 319. And Green was on probation for a crime much like the offense at issue in Davis. On the other hand, Leui's testimony was helpful but unnecessary and Leui was on probation for a DUI, an offense with no logical relevance to murder. "[T]he more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, credibility, or foundational matters." Darden, 145 Wn.2d at 619. Leui's testimony, while helpful, was ultimately cumulative.

Fleeks also relies on McDaniel, however it is similarly distinguishable. In McDaniel, the defendant was charged with assaulting Graham and Bothwell. McDaniel asserted self-defense against Bothwell, claiming Bothwell "initiated a fight while in a drug induced rage." McDaniel, 83 Wn. App. at 182. McDaniel denied assaulting Graham altogether and claimed his codefendant was exclusively responsible for her injuries. McDaniel, 83 Wn. App. at 182.

-31-

No. 82911-4-I/32

Defense counsel sought to admit evidence that Graham "lied under oath in a related civil proceeding regarding the recency of her drug use . . . the terms of [her] 1988 probation for possession of cocaine and her consequent motive to lie about her drug use on the day in question." McDaniel, 83 Wn. App. at 182-84. The trial court excluded this questioning but the court reversed, finding Graham's probation relevant because she had been ordered not to use drugs, which "provided her with a motive to lie . . . as to the extent and recency of her drug use." McDaniel, 83 Wn. App. at 186.

While similar, the reasoning in McDaniel discusses critical differences from this case. First, Graham perjured herself in a related proceeding, making the evidence highly relevant because it showed her willingness to lie about the same events at issue in the criminal trial. Leui, conversely, lied in an unrelated context about consumption of alcohol on probation. Second, evidence of Graham's substance abuse was cumulative, thus, it would not have independently prejudiced the State. With Leui, the evidence that he was on probation was not cumulative and would have unfairly prejudiced the State. Third, Graham was a critical witness because she was the only person who identified McDaniel as her attacker. McDaniel, 83 Wn. App. at 188. If the jury did not believe Graham, McDaniel would likely have been acquitted. Leui was not an essential witness because identity was not an issue and his testimony was cumulative.

Fleeks's right to confrontation was not violated by the inability to cross-examine Leui based on his probation status.

-32-

No. 82911-4-I/33

IX.

Fleeks argues that the prosecutor committed misconduct during closing argument by suggesting that defense counsel was appealing to the jury's sympathies. We disagree.

A.

To show a prosecutor committed misconduct, the defendant must show (1) that the prosecutor's conduct was improper and (2) that the defendant suffered prejudice as a result. State v. Schlichtmann, 114 Wn. App. 162, 167, 58 P.3d 901 (2002). Comments made during closing arguments are viewed within "the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

It is generally improper for a prosecutor to impugn defense counsel. State v. Lindsay, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). Statements are misconduct if they "fundamentally undermine" the attorney's role or integrity. Lindsay, 180 Wn.2d at 433. If defense counsel objected at trial, the court determines whether any impropriety "had a substantial likelihood of affecting the verdict." State v. Sakellis, 164 Wn. App. 170, 183-84, 269 P.3d 1029 (2011). In the absence of an objection, the error is waived unless the comment was flagrant, ill intentioned, and caused incurable prejudice. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

B.

The first challenged comment occurred during initial closing arguments. After discussing why the evidence does not suggest self-defense, the prosecutor stated:

-33-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82911-4-I/34

> There are now words being offered to you in hopes you will ignore the actions and the evidence and decide that the murder of Marlin George is somehow justified because Mr. Fleeks was indisputably dealt a really bad hand in life. So before we look at the defendant's actions, I want to talk a little bit about the words of [defense expert] Dr. Cunningham and the defendant.

Defense counsel did not object to this remark.

Because defense counsel did not object to this comment, Fleeks must show that it was flagrant, ill intentioned, and caused incurable prejudice. He cannot. The statement was a critique of defense counsel's argument and called the jury to look to the facts and evidence. It was not a comment on defense counsel personally. Even if telling the jury that defense counsel is asking them to ignore evidence is misconduct, it is not prejudicial enough to meet the high flagrant, ill intentioned standard.

Next, the prosecutor argued in closing:

> [K]icking and hitting of someone is absolutely reasonably likely to provoke a belligerent response; not like a loose, un-landed swing from a man who's unsteady on his feet, who has done nothing aggressive or physical or anything but maybe take some crack. The defendant's intentional acts of hitting and kicking Marlin George is what started the physical fight. That's what provoked the so-called belligerent response of Marlin George trying to defend himself. He commenced and provoked the fight, and to suggest that this is somehow Marlin George's fault for supposedly stealing some crack is awfully akin to saying he deserved it.

Defense counsel objected but the objection was overruled.

This comment was not an attack on defense counsel. Rather, the prosecutor responded to defense counsel's argument directing fault at George by saying he had "control over this situation," and describing him as a predator singling out a vulnerable teenager. Even improper statements are not a basis for reversal when they occur as a fair response to defense counsel's arguments or where otherwise provoked. State v.

-34-

No. 82911-4-I/35

Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). But here, the remarks were not even improper. The comment was not an attack on defense counsel's veracity, role, or personal integrity, but a criticism and disagreement about defense counsel's argument and rebuttal to the prosecutor's statements to the jury. Lindsay, 180 Wn.2d at 431-32.

Finally, Fleeks argues that the prosecutor's assertion that defense counsel was making a play for the jury's sympathy was improper. The prosecutor stated:

> No matter how Defense tries to play to your prejudice by characterizing Mr. George as an awful terrible 37-year-old taking advantage of an innocent, weak 19-year-old, those aren't the facts. Not sympathy nor prejudice should verdict be based on.

Defense counsel did not object to this remark.

The prosecutor continued:

> Defense counsel said to you that the State would've called an expert . . . if they had anything to say. Other speculative notions are that there are other reasons like not thinking it's worth it or needed or that this defense has anything to do with what happened other than a play for your sympathy. . . .

[Defense objection overruled.]

> [W]hat is the point of Dr. Cunningham's testimony; that the defendant expects criminality or violence from others, and therefore he gets to inflict violence on others with impunity, to seek it out and then claim no responsibility? The defendant did nothing to avoid the situation; not from the moment he grabbed his gun, loaded one in the chamber, went downtown to engage in behavior that he knows is dangerous, followed somebody who he apparently thought along with everybody else was dangerous and likely to have a weapon. He did nothing to avoid it when he kicked and hit him, not one thing. Mr. Fleeks held all the cards and he chose to play only one.

These comments mostly responded to defense counsel describing Fleeks's childhood and how he was influenced by seeing family members get shot and stabbed and analogizing George's crack cocaine pipe to the 9/11 hijackers. ("So what? It's only

-35-

No. 82911-4-I/36

a couple inches long.  Remember, the 9/11 hijackers used box cutters.")  One comment was objected to while the other was not.  Fleeks, however, cannot show prejudice under either standard.

Fleeks argues this case is analogous to State v. Cook, 17 Wn. App. 2d 96, 110, 484 P.3d 13 (2021), and State v. Warren, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008).  Neither case is applicable.

In Cook, the prosecutor claimed defense counsel was "not looking for the truth, because that's not what defense lawyers . . . need to do."  17 Wn. App. 2d at 109.  Similarly, in Warren, the prosecutor claimed defense counsel's "mischaracterizations" were "what people go through . . . when they deal with defense attorneys," and claimed counsel was "hoping that you are not smart enough to figure out what in fact they are doing."  165 Wn.2d at 29-30.  There, the statements were sweeping claims about defense lawyers and admonishing the role of defense attorneys.  Here, the prosecutor was explaining that the evidence about Fleeks's backstory was an attempt to pull at sympathies, it was not an admonishment of the defense counsel.  Fleeks cannot show prejudice here.

## VI.

We reverse the second degree murder conviction and remand for retrial.  We affirm the conviction for second degree unlawful possession of a firearm.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82911-4-I/37

WE CONCUR:

Mann, J.

Birk, J.

Andrus, C.J.