IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>  v.<br><br>ROTTER, RICHARD JAMES,<br><br>     Appellant. | No. 85246-9-I<br><br>UNPUBLISHED OPINION |

BOWMAN, J. — Richard James Rotter shot and killed Everett Police Department Officer Dan Rocha in a Starbucks parking lot. Rotter appeals his convictions and sentence. He argues that (1) insufficient evidence supports the jury's determination that he premeditated the murder, (2) he was unlawfully seized, (3) the prosecutor committed misconduct on cross-examination and during closing arguments, (4) a detective provided improper opinion testimony, and (5) a cumulation of the above errors requires reversal of his convictions. Rotter also asserts (6) the to-convict instruction for possession of a controlled substance with intent to manufacture or deliver lacked an essential element and (7) the court erred by imposing a victim penalty assessment (VPA). We affirm Rotter's convictions but remand for the trial court to resentence Rotter on the possession of a controlled substance count and to strike the VPA from his judgment and sentence.

FACTS

On March 25, 2022, Rotter drove a friend's Mini Cooper from the Tri-Cities to Everett to buy a Ford Fusion from a Craigslist seller. Rotter met the seller at a Starbucks in north Everett, test drove the car, and purchased it in cash. Rotter then stayed in the Starbucks parking lot and began moving items from the Mini Cooper to the Ford Fusion. The cars were parked side-by-side facing the street with their trunks facing the Starbucks.

At the same time, around 2:00 p.m., Officer Rocha was inside the Starbucks, waiting for his coffee order. As seen on Officer Rocha's body-worn camera (BWC),[1] he looked outside the window into the parking lot and noticed Rotter transferring a gun between the Mini Cooper's front passenger door and the Ford Fusion's front driver door. Rotter tried to conceal the transfer by leaving the Fusion's back driver's-side door open. Officer Rocha walked out of the Starbucks and radioed in the situation as "suspicious." He then approached Rotter near the trunks of the cars and said, " 'Hey, how's it going? Do me a favor, bud, leave the guns alone. Ok?' " Officer Rocha then asked, " 'What's going on with the guns,' " and Rotter responded, " '[N]othing.' " Rotter then told Officer Rocha the gun was a BB gun.

Around that time, Officer Rocha received a call from Everett Police Patrol Officer Ora Hamel. Officer Rocha told Rotter, " '[D]o me a favor, just hang tight

_____

[1] The appellate record also contains a transcript of Officer Rocha's interactions with Rotter as captured on his BWC. Along with Officer Rocha's BWC footage, two bystanders also recorded the incident—one used his cell phone to record the incident from inside the Starbucks and the other used her cell phone to record video from her apartment above the Starbucks parking lot. The court admitted all three videos at trial.

for a second.' " Officer Rocha answered his cell phone and explained to Officer Hamel that he " 'saw a guy moving a gun from one car to another car.' " After the call, Officer Rocha asked Rotter for identification and whether he had any guns on him. Rotter denied having any guns on his person. Officer Rocha then patted down Rotter's waist and front jacket pockets while Rotter held up his large and bulky jacket. Officer Rocha did not locate the firearm Rotter wore in a concealed shoulder holster under his left arm.

Rotter gave Officer Rocha his driver's license, which Officer Rocha ran through dispatch. Dispatch informed him there was an active domestic violence assault warrant for Rotter's arrest, which Officer Rocha communicated to Rotter and said, " 'So, you're not free to go.' " Officer Rocha asked dispatch to verify that Rotter is " 'not a convicted felon.' " Rotter overheard the question and admitted that he is a convicted felon, which dispatch confirmed. Shortly after, Officer Rocha determined that Rotter was lying about the gun being a BB gun and told Rotter he was " 'being investigated on suspicion of unlawful possession of a firearm.' "

At that point, Rotter became agitated as Officer Rocha explained, " 'You're a convicted felon, which you confirmed. . . . You told me that it was a BB gun. And now you just told me it wasn't. . . . So is that a BB gun, yes or no?' " Rotter said, " 'I don't know,' " and Officer Rocha told him they were going to " 'hang tight [until his] partner' " arrives. But Rotter began to turn toward the Ford Fusion and point at it. Officer Rocha instructed him, " 'Don't go towards the car.' " At the same time, Rotter kept pointing at the car and repeating the phrase, " 'I'm just

3

saying.' " Officer Rocha then told Rotter he was being " 'detained' " because he was not complying. He told Rotter to put his hands behind his back. But Rotter ignored the instruction.

Officer Rocha then grabbed Rotter's left arm to handcuff him while Rotter struggled to keep his right arm free. Officer Rocha ordered Rotter to put his right hand behind his back but Rotter again ignored the command. As Officer Rocha moved Rotter to the ground, Rotter reached under his left arm with his right hand, took the gun out of his concealed shoulder holster, and shot Officer Rocha twice in the shoulder area.[2] Rotter then moved the gun up to Officer Rocha's head and shot him point-blank three more times in the left side of his head. The gunshots to Officer Rocha's head killed him almost immediately.[3] Rotter then got in the Mini Cooper, put it in reverse, backed up over Officer Rocha's body, and dragged him several feet. He then ran over Officer Rocha again as he fled the parking lot. Several people saw the shooting and called 911.

Rotter drove erratically through Everett, hitting other cars as police officers pursued him. At one point, Rotter drove onto a sidewalk. He eventually crashed the Mini Cooper into two other cars in an intersection, which was severe enough to cause a van to roll over on its side. He then got out of the "destroyed" Mini Cooper. Everett Police Lieutenant Timothy Collings ordered Rotter to "get on the ground now." Rotter eventually complied, putting up his hands, taking off his

---

[2] One bullet embedded in Officer's Rocha's bulletproof vest below his left armpit and did not penetrate his body.

[3] The medical examiner testified that "[a]ny one of those three [gunshot wounds to Officer Rocha's head] would have caused his death."

4

empty shoulder holster, and then lying facedown on the ground. Everett Police Officer Devin Hackett handcuffed Rotter and searched him, during which Rotter screamed repeatedly, "They're after me." And later, "Help me." Rotter also asked Officer Hackett several times to "break his neck."

When medical personnel examined Rotter at the scene, Rotter told them he had ingested fentanyl. A blood sample drawn at 3:15 p.m. showed the presence of methamphetamine and fentanyl in Rotter's system. When the police searched the Ford Fusion, they found, among other things, rolls of aluminum foil, plastic baggies with suspected methamphetamine and heroin, 1,950 suspected fentanyl pills, a digital scale, a "drug ledger," a .22 caliber rifle, two boxes of .22 caliber ammunition, loose ammunition, a BB gun, a knife, and five loaded magazines for a 9 millimeter handgun.

The State charged Rotter with aggravated first degree murder with a firearm enhancement, count 1; second degree unlawful possession of a firearm, count 2; possession of a controlled substance with intent to manufacture or deliver with a firearm enhancement, count 3; and attempting to elude a pursuing police vehicle with an endangerment to others aggravator, count 4. While in jail awaiting trial, Rotter made hundreds of recorded phone calls and "video visits." In one call, he explained the incident by saying, "It's like a cat, take a wild cat and try to put a wild cat inside a cage. Yeah try that, yeah see what happens."

In February 2023, the trial court held a CrR 3.5 hearing to determine the admissibility of Rotter's statements to police; specifically, the audio and video footage recorded by Officer Rocha's BWC. The court found that all of Rotter's

5

statements to Officer Rocha were noncustodial and admissible at trial. In making its CrR 3.5 ruling, the court commented that because Officer Rocha saw Rotter in the parking lot "moving items between two different cars" and "conceal[ing] what he was doing," Officer Rocha had reasonable suspicion to conduct a *Terry*[4] stop and investigate for theft.

In March 2023, the case proceeded to a jury trial. The State called Detective Gregory Mueller, who testified as a drug trafficking expert.[5] Detective Mueller said that in his experience, the quantity of drugs found in Rotter's car and their street value suggested drug dealing, not personal consumption. Rotter offered testimony from clinical psychologist Dr. Wendi Wachsmuth. Dr. Wachsmuth testified that Rotter suffered from post-traumatic stress disorder, pervasive depressive disorder, a mild neurocognitive disorder, and several substance use disorders. She opined that given those diagnoses, Rotter was unable to premediate the murder because it would be "very difficult for him . . . to do something so planful and organized."

The jury found Rotter guilty as charged. In April 2023, the trial court sentenced Rotter to life imprisonment without the possibility of parole plus a consecutive 96 months for the firearm enhancements. It found Rotter indigent and waived all court costs but imposed a $500 VPA.

Rotter appeals.

---

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[5] While Mueller is an Everett Police Department officer, he is also a detective with the Snohomish Regional Drug Task Force, a multi-agency partnership of local, state, and federal officers, agents, and personnel that "focus primarily on [eradicating] illegal narcotics."

ANALYSIS

Rotter argues (1) insufficient evidence supports that he premeditated the murder of Officer Rocha, (2) he was unlawfully seized, (3) the prosecutor committed several acts of misconduct, (4) Detective Mueller offered improper opinion testimony, and (5) cumulation of the above errors requires reversal of his convictions. He also asserts (6) a to-convict jury instruction omitted an essential element and requires resentencing and (7) we should remand for the court to strike the VPA. We address each argument in turn.

1. Sufficiency of Premeditation Evidence

Rotter argues insufficient evidence supports the jury's determination that he premediated the murder of Officer Rocha. We disagree.

We review de novo the sufficiency of evidence. *State v. Hummel*, 196 Wn. App. 329, 352, 383 P.3d 592 (2016). To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. DeJesus*, 7 Wn. App. 2d 849, 882, 436 P.3d 834 (2019). A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences made from it. *State v. Fedorov*, 181 Wn. App. 187, 193-94, 324 P.3d 784 (2014). We defer to the fact-finder on issues involving conflicting testimony, witness credibility, and the persuasiveness of the evidence. *DeJesus*, 7 Wn. App. 2d at 883. Circumstantial evidence and direct evidence are equally reliable in determining the sufficiency of evidence. *State v. Scanlan*, 193 Wn.2d 753, 770,

445 P.3d 960 (2019). But "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

Premeditation differentiates first degree murder from second degree murder. *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986). Premeditation requires deliberation of more than a mere "moment in point of time." RCW 9A.32.020(1). The State must show "the deliberate formation of and reflection upon the intent to take a human life" by "thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991). The State may prove premeditation by circumstantial evidence where the jury's inferences are reasonable and substantial evidence supports its verdict. *State v. Pirtle*, 127 Wn.2d 628, 643, 904 P.2d 245 (1995). But premeditation cannot be inferred merely from an intent to kill. *State v. Commodore*, 38 Wn. App. 244, 247, 684 P.2d 1364 (1984). There are four characteristics particularly relevant to establishing premeditation: "motive, procurement of a weapon, stealth, and the method of killing." *DeJesus*, 7 Wn. App. 2d at 883.

Here, the trial court instructed the jury that to convict Rotter of first degree murder, the State must prove beyond a reasonable doubt that Rotter "acted with intent to cause the death of [Officer] Rocha" and that "the intent to cause the death was premeditated." It instructed that "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that

constitutes a crime." And, consistent with controlling case law, the jury

instruction defining "premeditation" states:

> Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

The court also instructed the jury that in determining whether Rotter had the

ability to form premeditation, it could consider "[e]vidence of mental illness or

disorder." And that "in determining whether the defendant acted with

premeditation, evidence of intoxication may be considered."

Viewing the evidence in the light most favorable to the State, a rational

trier of fact could conclude beyond a reasonable doubt that Rotter acted with

premeditation. The evidence showed that Rotter carried a gun to protect his

drugs but lied to Officer Rocha about the gun concealed in a shoulder holster

under his left arm. Specifically, Rotter denied having any guns on his person

when Officer Rocha ask him directly if he did, then manipulated his bulky coat to

hide the gun during Officer Rocha's pat down. And when Officer Rocha tried to

arrest Rotter, Rotter struggled to keep his right hand free so he could reach the

concealed gun. Further, after Rotter shot Officer Rocha twice in his shoulder

area, he moved the gun up and shot Officer Rocha point-blank in the head three

times. The jury also heard evidence from a jail call where Rotter explained the

incident by saying, "It's like a cat, take a wild cat and try to put a wild cat inside a

cage. Yeah try that, yeah see what happens."

Citing *Austin* v. *United States*, 382 F.2d 129 (D.C. Cir. 1967), *abrogated in part on other grounds by United States v. Foster*, 783 F.2d 1082 (D.C. Cir. 1986), Rotter argues that insufficient evidence supports premeditation. He contends that violence and multiple wounds standing alone cannot support premeditation. And that possession of a gun alone does not support premeditation because he "did not procure [a weapon] for the purpose of killing Officer Rocha."

In *Austin*, the defendant and the victim were seen together at an after-hours establishment before driving off together in the defendant's truck around 4:30 a.m. 382 F.2d at 132. The "Government produced no witness as to what happened" after. *Id.* But around 5:00 a.m., police saw the defendant near the victim, nearly deceased with 26 stab wounds. *Id.* A jury convicted the defendant of first degree murder and he appealed. *Id.* at 131.

The circuit court held that "the Government's evidence was insufficient to warrant submission to the jury on the issue of premeditation." *Austin*, 382 F.2d at 138. The court reasoned that the defendant's use of a knife to accomplish the murder was not probative of premeditation because he carried it "as a matter of course." *Id.* at 139. And that the violence and multiple wounds "standing alone" cannot support premeditation. *Id.* Further, the defendant's "ample time to premeditate and deliberate [between 4:30 a.m. and 5:00 a.m.] is not evidence" that he actually premeditated his intent to kill. *Id.* And finally, the prosecution did not show any motive for the crime. *Id.* The court concluded that "the jury could only speculate and surmise, without any basis in the testimony or evidence, that appellant acted with premeditation." *Id.*

10

This case is different than *Austin*. Here, the jury was not left to speculate about premeditation. The videos show Rotter became agitated and started moving toward the Ford when Officer Rocha told him he was being detained. And Rotter's statement on the jail call recording shows his desire to avoid arrest and incarceration. The videos of the incident also show Rotter concealed his gun from Officer Rocha, kept his right hand free to grab the gun, shot Officer Rocha two times in the shoulder area, and then deliberately moved the gun to Officer Rocha's head to shoot him three more times. Unlike in *Austin*, the evidence here shows that Rotter had motive to kill Officer Rocha, used stealth to avoid detection of the gun used to kill him, and shot Officer Rocha several times in a manner that ensured his death.[6]

Viewing the evidence as a whole, a rational juror could find premeditation beyond a reasonable doubt. Sufficient evidence supports the jury's finding that Rotter premeditated Officer Rocha's murder.

2. Unlawful Seizure

Rotter argues that Officer Rocha unlawfully seized him. According to Rotter, tainted evidence obtained from the unlawful seizure was "critical to the prosecution's theory of premeditation," so we must reverse his conviction. The State argues that Rotter waived this argument by failing to challenge the seizure below. We agree with the State.

Generally, we will not consider an issue raised for the first time on appeal unless it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). To

---

[6] Rotter also ran over Officer Rocha—twice.

show manifest constitutional error, the defendant must "identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights." *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). In the context of a defendant's failure to move to suppress evidence, the defendant "must show the trial court likely would have granted the motion if made." *Id.* at 333-34; *see also State v. Abuan*, 161 Wn. App. 135, 146, 257 P.3d 1 (2011) (To show actual prejudice, the appellant must establish "from an adequate record that the trial court likely would have granted a suppression motion."). If the trial record is insufficient to determine the merits of the constitutional claim, the error is not manifest. *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). If we conclude there is a manifest constitutional error, we then engage in a harmless error analysis. *State v. Harris*, 154 Wn. App. 87, 94, 224 P.3d 830 (2010).

Here, Rotter did not move under CrR 3.6 to suppress evidence in the trial court, so the court did not conduct a CrR 3.6 hearing. As a result, Rotter cannot raise the issue for the first time on appeal absent a showing of manifest error affecting a constitutional right. And he fails to make that showing.

First, Rotter fails to show that the record is sufficient for us to determine the merits of his belated motion to suppress evidence for an unlawful seizure. At issue in such a motion is whether a seizure occurred, when the seizure occurred, and whether the seizure is supported by reasonable suspicion. *See State v. Johnson*, 8 Wn. App. 2d 728, 735-37, 440 P.3d 1032 (2019). The defendant bears the burden of showing an unlawful seizure. *Id.* at 737.

12

CrR 3.6 describes the procedure that courts use to resolve motions to suppress. Under CrR 3.6(a), the motion must "be in writing supported by an affidavit or document setting forth the facts the moving party anticipates will be elicited at a hearing, and a memorandum of authorities in support of the motion." If the court determines that no evidentiary hearing is required, it will enter "a written order setting forth its reasons." *Id.* If the court conducts an evidentiary hearing, it "shall enter written findings of fact and conclusions of law" after the hearing. CR 3.6(b). The purpose of CrR 3.6 is to make a record " 'to aid an appellate court on review.' " *State v. Pulido*, 68 Wn. App. 59, 62, 841 P.2d 1251 (1992) (quoting *State v. Stock*, 44 Wn. App. 467, 477, 722 P.2d 1330 (1986)). We then review the trial court's findings of fact and conclusions of law to determine whether substantial evidence supports any challenged findings and whether the findings, in turn, support the conclusions of law. *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014).

Here, Rotter did not move to suppress evidence under CrR 3.6, so the record contains no affidavit setting forth the facts he believes support an unlawful seizure. Nor did the court hold a CrR 3.6 hearing, so no findings of fact or conclusions of law related to a motion to suppress exist for us to review.

Rotter argues that despite his failure to comply with CrR 3.6, all the facts necessary to review whether he was unlawfully seized are in the record on appeal. But the parties developed the record on appeal within the context of the State's CrR 3.5 motion. And that rule governs the admission of an accused's statements to police. CrR 3.5; *see also State v. McFarland*, 15 Wn. App. 220,

222, 548 P.2d. 569 (1976).

At issue during a CrR 3.5 hearing is whether the defendant was properly apprised of his Fifth Amendment rights before any custodial interrogation. *See State v. Piatnitsky*, 170 Wn. App. 195, 209-12, 282 P.3d 1184 (2012), *aff'd*, 180 Wn.2d 407, 325 P.3d 167 (2014); U.S. CONST. amend V. An encounter is custodial when "a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest." *State v. Lorenz*, 152 Wn.2d 22, 36-37, 93 P.3d 133 (2004). So, whether a person is lawfully seized is a different question than whether a person is in police custody. And, because Rotter failed to request a CrR 3.6 suppression hearing, the State had no opportunity to develop a record to show how the initial seizure was lawful.

In any event, even if the record were adequate for review, Rotter fails to show actual prejudice. While the trial court did not formally determine when a seizure occurred and whether the seizure was lawful, it commented in its CrR 3.5 findings and conclusions that the evidence showed a "valid [*Terry*] contact" supported by "reasonable suspicion." Specifically, it said that

> because [Rotter] was the sole individual moving items between two different cars in a parking lot and appeared to be attempting to conceal what he was doing, it was reasonable to believe that [he] might be involved in a theft.

As a result, Rotter does not show that the court likely would have reached a different result had he moved to suppress evidence under CrR 3.6.

Because Rotter fails to show manifest constitutional error, we decline to hear for the first time on appeal his argument that Officer Rocha unlawfully seized him.

### 3. Prosecutorial Misconduct

Rotter argues that the prosecutor committed misconduct by asking Rotter's expert witness "knowingly objectionable" questions on cross-examination, giving his personal opinion of the expert's testimony during closing argument, and vouching for law enforcement's investigation during rebuttal closing argument. We disagree.

Prosecutorial misconduct may deprive a defendant of his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of our state constitution. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail on a prosecutorial misconduct claim, the defendant must show "that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *Id.* at 704. Misconduct is prejudicial if the defendant shows "a substantial likelihood that the misconduct affected the jury verdict." *Id.* We consider the prosecutor's arguments "in the context of the case, the arguments as a whole, the evidence presented, and the jury instructions." *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021). And we presume the jury follows the trial court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009).

When the defendant fails to object to an improper remark, he waives the error " 'unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.' " *Slater*, 197 Wn.2d at 681 (quoting *State v. Russell*, 125

Wn.2d 24, 86, 882 P.2d 747 (1994)).  The focus is on whether the resulting prejudice could have been cured.  *Id.*; *see also State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003) ("If the prejudice could have been cured by a jury instruction, but the defense did not request one, reversal is not required.").

A.  Cross-Examination of Dr. Wachsmuth

Rotter argues that the prosecutor made argumentative and knowingly objectionable statements to Dr. Wachsmuth "in the guise of questions."  The State argues that Rotter waived this argument by not properly objecting to the questions and that in any event, the questions did not amount to misconduct. We agree with the State.

Attorneys may cross-examine a witness about matters that affect credibility by showing bias, ill will, interest, or corruption.  *Russell*, 125 Wn.2d at 92.  But a prosecutor cannot persistently ask knowingly objectionable questions "because it places opposing counsel in the position of having to make constant objections."  *Teter v. Deck*, 174 Wn.2d 207, 223, 274 P.3d 336 (2012).  A prosecutor's improper remarks are generally not grounds for reversal if they were invited or provoked by defense counsel and are in reply to defense counsel's acts or statements.  *Russell*, 125 Wn.2d at 86.  An exception applies when the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective.  *Id.*

Here, defense counsel questioned Dr. Wachsmuth on direct examination about her diagnoses of Rotter and her opinion that he "did not have the ability" to premeditate the murder.  Dr. Wachsmuth testified that her role as a clinical

16

psychologist is "to be as neutral an evaluator as I can be when I'm making certain decisions about a person's mental health functioning." This led to several questions by the prosecutor on cross-examination designed to undermine Dr. Wachsmuth's credibility and neutrality as well as Rotter's defense. Those questions are the subject of Rotter's misconduct allegation and discussed below.

After Dr. Wachsmuth admitted there was "no doubt" that Rotter killed Officer Rocha, the prosecutor asked, "So it would be fair to say that he knew that a mental health defense was probably the one option he had, right?" Dr. Wachsmuth responded, "I can't say that." As much as that question may have been improper, Rotter did not object. And he fails to explain why an instruction could not have cured any prejudice.

The prosecutor later established that Dr. Wachsmuth had not watched the video taken by the bystander from inside the Starbucks because, as she stated, it might "bias my opinion and my view of what I'm actually trying to assess." The prosecutor clarified, "So your reason for not watching it is because you thought that the . . . video might bias you?" Dr. Wachsmuth said "yes" and the prosecutor asked, "Because it's pretty awful stuff, right?" Dr. Wachsmuth responded, "Correct." Rotter now argues that the latter question was improper. But again, he did not object and does not explain how this line of questioning was improper or prejudicial.

Rotter next challenges the prosecutor's questions about Rotter's attempt to keep his right hand free when Officer Rocha tried to arrest him. When Dr. Wachsmuth agreed that Rotter accessed his weapon with his right hand, the

prosecutor asked whether "the defendant made some pretty serious and sustained efforts to keep his right hand free so he could access that weapon." Dr. Wachsmuth said, "I don't know why he kept it free." The prosecutor then asked, "Wouldn't his actions, once he got his hands on the gun, kind of inform why he was keeping that hand free?" Dr. Wachsmuth said, "Sure. Possibly." The prosecutor responded, "Okay. Don't play, you know, word games. I mean, he's keeping that hand free to get the weapon, correct? Because that's what he did." Defense counsel objected and the court sustained the objection.

As much as the prosecutor's question may have been argumentative, Rotter does not explain how the question amounts to misconduct or how he was prejudiced. Particularly when Dr. Wachsmuth did not answer the question, the court sustained the objection, and it later instructed the jury that the lawyers' statements are not evidence.

Rotter also challenges the prosecutor's questions to Dr. Wachsmuth about how Rotter's sources of income did not support his claim that the vast amount of high-value drugs he possessed were for his personal use. And that despite Dr. Wachsmuth's testimony about her neutrality, she did not question Rotter about the inconsistency.

On cross-examination, Dr. Wachsmuth agreed that Rotter told her that his main source of income was disability and that he supplemented that income by "flipping cars." And she agreed that the jury heard testimony that the police discovered drugs in Rotter's vehicle valued between $9,000 and $15,000. The prosecutor asked Dr. Wachsmuth, "Would you agree with me that that amount of

18

drugs is an unusually high dollar amount for someone who is on disability and is making money by flipping cars?" Defense counsel objected and the court sustained the objection.

The prosecutor followed up:

I guess the question ultimately becomes, is that when [Rotter] was giving you his description of his work history and how he made money and his report to you was disability income and flipping cars, you didn't challenge him on that based upon your knowledge of the drugs that [were] located in the vehicle?

Dr. Wachsmuth answered, "No." The prosecutor then said, "Okay. You just let that one slide?" The court sustained Rotter's objection.

Again, Rotter does not explain how these questions amount to misconduct or how they prejudiced him.

Finally, Rotter challenges two of the prosecutor's questions intended to discredit Dr. Wachsmuth's testimony that Rotter could not have premeditated Officer Rocha's murder. First, the prosecutor suggested to Dr. Wachsmuth that Rotter's plan on the day of the incident to drive to Everett and buy a car "sounds like a lot of planning and a lot of acting based upon that plan." Rotter objected and the court sustained the objection, asking the prosecutor to rephrase the question, which he did. The prosecutor then asked Dr. Wachsmuth whether it was "fair to say it was pretty obvious that [Rotter] was attempting to conceal that gun when he lifted his coat up." Rotter objected and the court sustained the objection. But again, Rotter does not identify how these questions amount to misconduct or how he suffered prejudice.

19

Rotter fails to show that the prosecutor purposefully attempted to subvert the rules of evidence or that his questions on cross-examination amounted to misconduct.

B. Closing Arguments

Rotter argues that the prosecutor committed misconduct by giving his personal opinion of Rotter's expert's testimony and vouching for law enforcement's investigation during closing arguments.

I. Personal Opinion

Rotter argues that the prosecutor improperly expressed his personal opinion of Dr. Wachsmuth's testimony in closing argument. The State argues that Rotter waived this argument because he failed to object and an instruction could have cured any prejudice. We agree with the State.

It is improper for a prosecutor to express their personal opinion about the credibility of a witness. *Anderson*, 153 Wn. App. at 428. To determine whether the prosecutor is expressing an improper personal opinion, we view the challenged comments in context. *Id.* The comments amount to prejudicial error only when it is clear and unmistakable that the prosecutor is not arguing an inference from the evidence but expressing a personal opinion. *Id.*

Here, Rotter challenges the prosecutor's closing argument about how Dr. Wachsmuth framed the concept of premeditation. The prosecutor argued to the jury:

> There are very few things that I agreed with what Dr. Wachsmuth said yesterday, but one of the things that she said and wrote that I'm in complete agreement is that the defendant didn't go

to Everett, Washington, from Kennewick with the plan to harm anyone. That's absolutely correct.

. . . .

That's interesting, but it's not particularly relevant to what you have to decide, because that's not the issue. The issue isn't whether this guy, when he got up in the morning, decided, I'm going to go kill a cop. Because that's not what happened. The evidence just doesn't show that.

But neither does premeditation, the legal definition of premeditation, require that.

We agree that the prosecutor's comments improperly expressed a personal opinion about Dr. Wachsmuth's testimony. But Rotter failed to object, so he waived the error unless the court could not have cured it with a jury instruction. And because the court could have cured the improper comment by an admonishment to the jury to disregard the prosecutor's personal opinion, Rotter waived the error.

## II. Vouching and Burden Shifting

Rotter asserts that the prosecutor impermissibly vouched for law enforcement's investigation and shifted the burden of proof to him during its rebuttal closing argument. The State argues the prosecutor's comment was not prejudicial because the court instructed the jury to disregard it. Again, we agree with the State.

In closing argument, a prosecutor has wide latitude to argue reasonable inferences from the evidence. *Slater*, 197 Wn.2d at 680. But the prosecutor "must not refer to evidence that has not been admitted." *Id.* at 681. A prosecutor commits misconduct by vouching for a witness' credibility, either by placing the prestige of the government behind the witness or by suggesting that information not presented to the jury supports the witness' testimony. *State v. Stotts*, 26 Wn.

App. 2d 154, 167, 527 P.3d 842 (2023).  It is also improper for the prosecutor to argue that the defendant bears the burden of proof.  *State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011).

Here, in his closing argument, Rotter's counsel pointed out that "the investigative team made the decision that three detectives needed to go to Mr. Rotter's hometown [in the Tri-Cities] to get evidence about — to shed light on his mental state . . . because that was still missing from the State's case."  Defense counsel asserted that the detectives "spent three days talking to witnesses, but they didn't find anything that they wanted to hear.  They didn't come back with evidence of premeditation, which was . . . missing."  Then, in the State's rebuttal, the prosecutor argued that "[i]f there was evidence, good or bad, from the Tri-Cities, you would have heard about it."  Rotter objected, and the court sustained the objection and directed the jurors to "disregard the last comment."

Assuming the prosecutor's comment improperly vouched for the investigation or shifted the State's burden, Rotter fails to show prejudice.  The court ordered the jury to disregard the comment and, again, "we presume the jury follows the trial court's instructions."  *Anderson*, 153 Wn. App. at 428.[7]

4.  Improper Opinion Testimony

Rotter argues that we must reverse his aggravated murder and drug-related convictions because Detective Mueller expressed an improper personal opinion on Rotter's guilt that "invad[ed] the province of the jury."  We disagree.

---

[7] Rotter argues that even if the prosecutor's cross-examination questions and closing arguments did not individually amount to misconduct, the record as a whole shows the prosecutor's strategy to discredit Rotter's expert through misconduct.  But no evidence supports his claim that the prosecutor engaged in such a strategy.

An expert witness properly expresses an opinion when it is "not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence." *State v. Smiley*, 195 Wn. App. 185, 189-90, 379 P.3d 149 (2016). But opinion testimony is improper when it comments on the witness' veracity or intent, tells the jury what decision to reach, or concludes that a defendant is guilty. *State v. Fleeks*, 25 Wn. App. 2d 341, 369, 523 P.3d 220, *review denied*, 1 Wn.3d 1014, 530 P.3d 185 (2023). A witness who provides an opinion, directly or by inference, on a defendant's guilt violates the defendant's constitutional right to a jury trial. *Smiley*, 195 Wn. App. at 189. Specifically, it impedes the jury's ability to independently determine the facts. *Fleeks*, 25 Wn. App. 2d at 368.

An expert can express an opinion on a subject even though it embraces an ultimate fact to be found by the jury. *Kirkman*, 159 Wn.2d at 929. But to avoid witnesses expressing their personal beliefs about the defendant's guilt, "one permissible and perhaps preferred way" for trial counsel to question an expert is to phrase a question embracing the ultimate fact in terms of " 'is it consistent with' instead of 'do you believe.' " *State v. Montgomery*, 163 Wn.2d 577, 592, 183 P.3d 267 (2008).

Here, the State asked Detective Mueller on direct examination about the amount and value of drugs found in Rotter's vehicle and whether those quantities were more consistent with drug dealing or personal use.

> Q.  . . . [B]ased on the amount of methamphetamine that is there, 10.18 grams, were you able to approximate a street value that that would go for?
>
> . . . .

A.    I estimated it between $270 and $360.

Q.    The amount of drugs that are there, in your numerous contacts with people that typically are just drug users versus drug dealers, did you draw a conclusion as to the amount of drugs that are present as to whether or not that is consistent with dealing or using?

A.    In my training and experience, it would be more consistent with dealing.

. . . .

Q.    Were you able to approximate a street value as to the amount of heroin that was present?

A.    I was. . . . It was between $1,300 and $1,625 based on . . . that 1/16 of an ounce . . . sale.

Q.    Okay.  And based on your training and experience and contact over the years with drug users versus drug dealers, was the amount of drugs, the over 20 grams present, more consistent with drug using or drug dealing?

A.    Drug dealing, sir.

Q.    Okay.  And then the various suspected fentanyl pills which totaled 1,950 pills, you talked to us about what the typical user amount is and the amounts it would go for.  Were you able to approximate a street value of the fentanyl that was found in that black camera bag?

. . . .

A.    That was between $7,800 and over $13,000.

Q.    Okay.  And based on your training and experience in contacting drug traffickers and drug users, was this more consistent with personal use or dealing?

A.    Most definitely dealing.

Viewed in context, Detective Mueller did not express a personal opinion on Rotter's guilt.  Instead, his testimony made inferences from the evidence and "explained the arcane world of drug dealing," which "was helpful to the trier of fact in understanding the evidence."  *State v. Avendano-Lopez*, 79 Wn. App. 706, 711, 904 P.2d 324 (1995).

Still, Rotter argues that like a detective's testimony in *Montgomery*, Detective Mueller's testimony was improper.  In that case, the detective testified he " 'felt very strongly that [the defendants] were, in fact, buying ingredients to

24

manufacture methamphetamine.' " *Montgomery*, 163 Wn.2d at 587-88. Our Supreme Court concluded the opinion was improper because it "went to the core issue and the only disputed element, [the defendant]'s intent." *Id.* at 594. The court noted it was "very troubling" that the testimony "used explicit expressions of personal belief." *Id.*

As discussed above, Detective Mueller did not express a personal belief that Rotter possessed drugs with the intent to distribute them. Instead, he commented generally that the amount of drugs and other evidence seized from Rotter's car were more consistent with drug dealing than with personal use. The testimony was not improper.

5. Cumulative Error

Rotter argues that the above cumulative errors of insufficient evidence supporting premeditation, unlawful seizure, prosecutorial misconduct, and Detective Mueller's improper opinion testimony denied him a fair trial. We disagree.

The cumulative error doctrine applies when a cumulation of errors produce a fundamentally unfair trial. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Application of the doctrine "is limited to cases where there have been several trial errors." *State v. Azevedo*, 31 Wn. App. 2d 70, 85-86, 547 P.3d 287 (2024). Because Rotter has not shown several errors, he is not entitled to relief under the cumulative error doctrine.

6. <u>To-Convict Jury Instruction</u>

Rotter argues that the to-convict jury instruction for count 3, possession of a controlled substance with intent to manufacture or deliver, omitted an essential element and requires resentencing. The State concedes error and agrees Rotter should be resentenced on that count.

We review the omission of an element from a to-convict instruction de novo. *State v. Clark-El*, 196 Wn. App. 614, 619, 384 P.3d 627 (2016). Even when a defendant fails to object to the instruction at trial, the error is of sufficient constitutional magnitude to warrant review on appeal. *Id.*

A to-convict jury instruction must include all essential elements of the crime charged. *Clark-El*, 196 Wn. App. at 618. "When the identity of a controlled substance increases the statutory maximum sentence which the defendant may face upon conviction, that identity is an essential element." *Id.* A jury instruction that omits an essential element is harmless if it appears beyond a reasonable doubt that the error did not impact the verdict. *Id.* at 620. But if a court "imposes a sentence that is not authorized by the jury's verdict, harmless error analysis does not apply." *Id.* at 624.

Here, the State charged Rotter with possession of a controlled substance with intent to manufacture or deliver, "to-wit: Fentanyl, Heroin, and Methamphetamine." All three substances elevate the crime of possession and intent to distribute to a class B felony. RCW 69.50.401(2)(a), (b); *see* RCW 69.50.204(b)(11) (heroin is a schedule I controlled substance); RCW 69.50.206(c)(9), (d)(2) (fentanyl and methamphetamine are schedule II controlled

26

substances). But the to-convict instruction required the jury to find only that Rotter had the intent to manufacture or deliver "a controlled substance," which is a class C felony. RCW 69.50.401(2)(c). Still, the court sentenced Rotter as if the jury found him guilty of a class B felony.

The State concedes that sentencing Rotter to a class B felony without a finding from the jury that Rotter possessed a specific controlled substance was error. *See Clark-El*, 196 Wn. App. at 624-25. It also agrees that Rotter must be resentenced on that count. We accept the State's concession and remand for resentencing on count 3.

7. VPA

Finally, Rotter argues that the trial court erred by imposing a $500 VPA under former RCW 7.68.035(1) (2018) because he was indigent at the time of sentencing. The State concedes the court should strike the VPA on remand. We accept the State's concession.

The trial court sentenced Rotter on April 17, 2023 and found him indigent at the time. It waived all financial obligations except the VPA. Three months later on July 1, 2023, the legislature's amendment to RCW 7.68.035 took effect, providing that the court "shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4).

Although the statutory amendment did not go into effect until after Rotter's sentencing, our Supreme Court has held that statutory amendments pertaining

"to costs imposed upon conviction" apply prospectively to cases that are not yet final. *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018); *see also State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) ("Although [the] amendment [to RCW 7.68.035] will take effect after [the defendant]'s resentencing, it applies to [the defendant] because this case is on direct appeal."). Because Rotter's case was on direct appeal at the time the amendment to former RCW 7.68.035(1) took effect, we remand to strike the VPA.

We affirm Rotter's convictions but remand for the trial court to resentence him on count 3 and to strike the VPA from his judgment and sentence.

Brunner, J.

WE CONCUR:

Feldman, J.

Dwyer, J.